United States District Court for the Western District of Texas
Austin Division

| | | |
|---|---|---|
| Brenda Ramos, on behalf of herself and | § | |
| the Estate of Mike Ramos, | § | |
|     Plaintiff, | § | |
| v. | § | Case no. 1:20-cv-1256 |
| | § | |
| City of Austin and | § | |
| Christopher Taylor, | § | |
|     Defendants. | § | |

**Plaintiff's Complaint and Request for Jury Trial**

To the Honorable Court:

    1.    This is a lawsuit about Austin police officer Christopher Taylor who shot and killed Brenda Ramos's unarmed son, Mike Ramos, on April 24, 2020.

    2.    A bystander's cell phone video[1] and Austin police dashcam and body-worn camera videos[2] show Officer Taylor shoot Mike as he slowly drove forward and away from police. Or—in the sterile, dehumanizing way that Austin police speak about killing an Austinite's loved one—"The male subject drove forward out of the parking spot. Fearing the male subject intended to use the Toyota Prius as a deadly weapon, one patrol officer fired his patrol rifle, striking the male driver."[3]

    3.    Regardless of Officer Taylor's irrational fears, any competent police officer would have known that shooting a suspect in the head because he was driving away from police and bystanders—toward a dead-end blocked by dumpsters and a building—was a gross civil rights violation.

    4.    Ms. Ramos brings this lawsuit to vindicate her son's civil rights and for her own heartbreak and damages from losing her only child to excessive, unjustified police violence.

---

[1] *Mother of man killed by Austin police officer asks for answers*, Austin American-Statesman (May 31, 2020), available at https://www.youtube.com/watch?v=7dQMDiUpLHU&feature=youtu.be.
[2] http://austintexas.gov/apd-critical-incidents/officer-involved-shooting-april-24-2020.
[3] *Austin Police Report Confirms Michael Ramos Was Fatally Shot, Says Officer Considered Car A Weapon*, KUT (May 20, 2020), available at https://www.kut.org/austin/2020-05-20/austin-police-report-confirms-michael-ramos-was-fatally-shot-says-officer-considered-car-a-weapon.

**I. Parties**

5. Brenda Ramos was born, raised, and has lived her whole life in Austin. She went to Travis High School. Her son Mike was also a native Austinite, born and raised. He attended Covington and played football at Bowie High School.

[4]

6. The City of Austin is a Texas municipal corporation in the Western District of Texas. Brian Manley is Austin's policymaker when it comes to policing.

7. Christopher Taylor is an Austin police officer.

**II. Jurisdiction**

8. This Court has federal question subject matter jurisdiction over this 42 U.S.C. § 1983 lawsuit under 28 U.S.C. § 1331.

9. This Court has general personal jurisdiction over Taylor because he works and lives in Texas. The City is subject to general personal jurisdiction because it is a Texas municipality.

10. This Court has specific personal jurisdiction over Taylor and the City because this case is about their conduct that occurred in Austin.

**III. Venue**

11. Under 28 U.S.C. § 1391(b), the Western District of Texas is the correct venue for this lawsuit because the events occurred in Austin.

---

[4] Little Mike with his mom and with his dad, 1979

## IV. Facts

### A. Officer Taylor killed Mike Ramos without justification.

12. On April 24, 2020, Austin Police responded to a 911 report about a man with a gun and a woman using drugs in a gold and black Prius in the front parking area of a South Austin apartment complex. The man was Mike Ramos and he did not, in fact, have a gun:

> Operator: Austin 911, do you need police, fire, or EMS?
>
> Caller: Police.
>
> Operator: Okay. To what address or location?
>
> Caller: 2601 South Pleasant Valley.
>
> Operator: I'm sorry you said 2601 South Pleasant Valley?
>
> Caller: Yeah.
>
> Operator: Okay, hold on just one moment, please. Okay. At the Rosemont at Oak Valley Apartments?
>
> Caller: Yeah. I'm in the Rosemont Apartments, it's a – it's a – it's a gold and black Prius outside. (unintelligible).
>
> Operator: I'm sorry. The phone is real muffled. I couldn't hear what you were saying.
>
> Caller: I can barely hear you.
>
> Operator: Okay. I need you to start over. I couldn't understand anything you were saying. What's going on?
>
> Caller: They're in the car smokin' crack and cookin' meth.
>
> Operator: Okay. What color and type of vehicle is it?
>
> Caller: Uh, it's a gold Prius. It's a gold Prius with a Hispanic man and Hispanic woman. They got toilet paper in the front – toilet paper in the front dash window. And I seen him with a gun, he had a gun, too.
>
> Operator: You said a gold and black Prius?
>
> Caller: Yes. And he has a gun. He has a gun to this lady.
>
> Operator: You see him holding one to her?
>
> Caller: Yes, I seen him holding a gun, maam.
>
> Operator: Is he doing that right now?
>
> Caller: Yes.
>
> Operator: Just one moment. Is he pointing it at her?
>
> Caller: He's – he's – he's holding it up.
>
> Operator: He's holding it up? Or is he pointing it at her?

Caller: He – he was pointing it at her. But he got – he got – maam, **I don't know what's goin' on**[5] but I need yall to come quick.

Operator: Okay. But I need to know the difference. Is he pointing it at her or just holding in, it up?

Caller: He's holding it. He's holding it.

Operator: Okay. Is he – is he – but you said Hispanic male. Could you see what color clothing he has on?

Caller: Uh, it's like a white shirt. (Unintelligible) it's a gold and black Prius. He has . . .

Operator: Okay. Are they- okay.

Caller: I'm (unintelligible).

Operator: I need you to – (redacted), I understand. I already have officers en route. I'm trying to get this information to them. Where at in the parking lot? Is he by a particular building number? Or – okay. I can't understand anything you're saying. You're pulling the phone away or something.

Caller: The first – the first left – it's gonna be the first left.

Operator: When you enter the apartments?

Caller: Yes. It's gonna be the first left. It's gonna be the first left (unintelligible).

Operator: Okay. I do – like I said, I have officers already en route right now.[6]

13. Austin Police Chief Brian Manley summarized what happened next in his report about

the shooting to the Texas Attorney General:

Before arriving at the scene, officers stopped briefly to discuss their response to the area and create a plan before attempting to approach the subjects in the vehicle. **After formulating a course of action, officers approached the area in marked patrol units. Officers strategically parked their patrol vehicles, effectively blocking the exit and mitigating the risk of flight.**[7] Officers observed the Toyota Prius backed into a parking spot in the apartment complex parking lot near the one-way entrance/exit. Officers immediately commanded both subjects to show their hands as police communications identified the nature of the call as "gun urgent." Officers continued to give verbal

---

[5] As it turned out, the caller truly did not know what was going on. The police found a man and a woman in a gold and black Prius, but the man was not, in fact wearing a white shirt (Mike's shirt was red) and he was not, in fact, in possession of a gun. Upon information and belief, the caller deliberately swatted Mike. "Swatting" is defined in the Cambridge Dictionary as:
> the action of making a false report of a serious emergency so that a SWAT team (a group of officers trained to deal with dangerous situations) will go to a person's home, by someone who wants to frighten, upset, or cause problems for that person

*available at* https://dictionary.cambridge.org/dictionary/english/swatting.

[6] http://austintexas.gov/apd-critical-incidents/officer-involved-shooting-april-24-2020.

[7] This binding evidentiary admission by the City belies Officer Taylor's irrational fear that Mike would use the Prius as a deadly weapon. Officer Taylor claims that he killed Mike because he feared that "the male subject intended to use the Toyota Prius as a deadly weapon." Brian Manley reported to the Texas Attorney General that the strategic decision about where to place the police vehicles was effective.

4

commands as both the male and female exited the vehicle. Officers commanded the male subject to lift his shirt and turn around in a circle. The male subject initially complied with commands but eventually became non-compliant and verbally confrontational. **The male subject began asking why officers had guns pointed at him and asked officers to put their weapons away.** The male subject walked back toward the driver's door of the Toyota Prius and remained non-compliant and verbally confrontational. The male refused verbal commands from officers to step forward and away from the driver's door. Due to the nature of the call and the 911 caller's information, officers had reason to believe the Toyota Prius could contain a gun. Due to the male subject's noncompliance and ability to possibly access a gun inside the vehicle or on his person, officers decided to deploy a less-lethal munition to gain compliance. The less-lethal munition struck the front of the male subject on the left side of his body but did not prove to be effective as the male subject quickly entered the driver's door of the Toyota Prius. The male subject closed the driver door and started the vehicle. Officers commanded the driver to turn off the vehicle but he did not comply. Approximately nine seconds later, the male subject drove forward out of the parking spot. [emphasis added].

14. While Chief Manley's report to the Attorney General essentially reflects the sequence of events, it fails to capture the chaotic, conflicting shouts by the officers and Mike's incredulity over why police were threatening to shoot him. Compare Manley's statement to the Texas Attorney General that, "the male subject began asking why officers had guns pointed at him and asked officers to put their weapons away," to the audio recordings:

> **Officer: Keep going! Keep going! Keep going! Stop! Stop! Walk toward me!**
>
> Mike: Man, what the fuck?! Why (unintelligble)?
>
> **Officer: Come toward us!**
>
> **Officer: Michael Ramos, you are gonna get impacted if you don't listen! Walk toward me!**
>
> Mike: Man, yall scaring the fuck out of me, dog.
>
> **Officer (not to Mike): Impact him.**
>
> **Officer: Michael Ramos! Michael Ramos!**
>
> Mike: Don't shoot, yall!
>
> **Officer: Michael Ramos!**
>
> Mike: Don't shoot!
>
> **Officer: Hey listen to me, man. Hey, relax! Relax, Michael! I need you to turn around for me. Michael! Michael, listen to me, man! Michael, listen to me, man. Just listen. I want you to turn around for me, man. Turn around for me, Michael! I'll explain it in a second.**
>
> **Officer: Don't go back!**
>
> Mike: What is going on?!
>
> **Officer: I cant explain it right now, Michael, but you need to turn around.**

**Officer: Leave your hands up!**

**Officer: Do not go toward that door!**

Mike: Man, what the fuck, man?!

**Officer: Michael Ramos, come toward me!**

**Officer: Impact him.**

Mike: Man what the, MAN WHAT THE FUCK did I fucking do, man?! The fuck are yall trippin' on, dog?!

**Officer: Hey, hey, Michael, get on your knees! Get on your knees!**

Mike: Man, why the fuck you fuckin' shoot, man?!

**Officer: Michael, get on your knees! Do it now!**

Mike: Man, what the fuck yall trippin on dog?!

**Officer: Come out of the vehicle!**

**Officer: Michael, do it now!**

Mike: Why all yall got guns, dog?! Man, what the fuck, man?!

**Officer (screaming): IMPACT HIM!**

Mike: What the fuck?!

**Officer (not to Mike): Hit him with the impact whenever you get an angle.**

Mike: I ain't GOT no fucking gun, dog! What the fuck?! (Unintelligible).

**Officer (not to Mike): Hit him whenever you feel justified. He's not following commands and he has a weapon.[8]**

Mike: Put the fucking gun down, dog! Man, what the fuck, dog?

**Officer (not to Mike): Impact him.**

**Officer Pieper: Walk towards us! I'm going to impact you!**

**Officer: Keep your hands up, Passenger!**

Mike: Impact me?! For what?!

**Officer Pieper: Walk towards us! Comply with us!**

Mike: Fuck! Put the fucking guns down, dog!

**Officer Pieper: Comply with us!**

**Officer (not to Mike): Whenever you get a shot, go for the hit.**

Mike: Man, what the fuck, dog?!

**Officer Pieper: IMPACTING!**

---

[8] This order from a senior officer to a trainee officer is confounding given that videos show that Mike—who *had* complied with police commands to lift his shirt and turn in a circle—did not, in fact, have a weapon. There was no weapon or anything that could be mistaken for a weapon throughout this incident.

**Gunshot.**

15. As Chief Manley reported to the Attorney General, Mike got back in his car after Officer Pieper shot him with the "less lethal" shotgun shell. Mike never threatened the officers or bystanders. He simply got back in his car. Nine seconds later, as Mike slowly drove forward and away from police and bystanders toward the dumpsters at the dead-end of the parking area, Officer Taylor shot Mike in the head and killed him. There was no gun on Mike, in the car, or in the vicinity. Officers never saw a gun or anything they mistook for a gun.

**B. Austin fostered the institutionally racist and aggressive policing culture that led to Mike Ramos's death.**

16. In 2016, the Center for Policing Equity found that Austin police officers used more violence in the neighborhoods where Black and Hispanic Austinites live than in predominantly white neighborhoods. The study adjusted for crime and poverty variables and found that Austin police officers' use of force in those communities was disproportionate and unjustified. Austin police were more likely to use severe force against Black people and other people of color. Austin police were disproportionately more likely to shoot rather than use their hand-to-hand training or deploy pepper spray when the person subjected to force was Black.

17. The Austin City Council criticized the Austin Police Department's patterns of racist behavior and outcomes in December 2019, *less than five months before Officer Taylor, a white officer, killed Mike Ramos, a mixed race Black and Hispanic Austinite*:

> APD's state-mandated racial profiling reports consistently show that Black and Latino drivers are more than twice as likely to be searched as their white counterparts during traffic stops despite similar "hit rates", including in 2018 where 6% of traffic stops of white drivers resulted in a police searches compared to 14% for Latino drivers and 17% for Black drivers.

> APD data provided per Council Resolution No. 20180614-073 (one of the Freedom City Resolutions) showed that in 2017 APO [sic] police officers made discretionary arrests of African Americans at more than twice the rate of either White or Latino residents.

> That same 2017 data also showed Black and Latino residents accounted for nearly 75% of those discretionary arrests for driving with an invalid license, although the two groups combine to make up less than 45% of Austin's population.

> That same 2017 data also showed that one out of every three discretionary arrests for misdemeanor marijuana possession involved a Black resident even though less than one in ten Austinites is Black, while usage rates of marijuana are similar across racial groups.

> Per the quarterly report for Council Resolution No. 20180614-073, issued by APD on May 3, 2019, African Americans comprised 32% of persons arrested by APD for offenses eligible for citation, which, proportionally, amounts to more than three times Austin's Black population.

An anonymous whistle-blower recently accused an Assistant Chief of the Austin Police Department of using racist epithets and derogatory terms, including "nigger," to refer to specific Black elected officials and sworn officers of the Austin Police Department.

Patterns and specific incidents of discrimination and bigotry in the Austin Police Department erode the public trust, which is necessary to effectively enforce the law, solve crimes, and maintain public safety, and so the Council finds it imperative to understand the full extent of bigotry and systemic racism and discrimination within APD, and consider reforms to APD's policies, protocols, and training curriculum.

18. The Austin Office of Police Oversight, Office of Innovation, and Equity Office published a joint report in January 2020 (*less than four months before Officer Taylor killed Mike Ramos*) critical of the Austin Police Department's policing practices based on race during motor vehicle stops:

Data reveals racial disparities in motor vehicle stops in 2018, with Black/African Americans as the most overrepresented of all racial/ethnic groups in Austin.

In 2018, Black/African Americans made up 8% of the Austin population, 15% of the motor vehicle stops, and 25% of the arrests.

Black/African Americans and Hispanic/Latinos are increasingly overrepresented in motor vehicle stops from 2015-2018. White/Caucasians are increasingly underrepresented during the same time period.

Data from 2018 shows that Black/African Americans are disproportionately overrepresented in cases when their race is known by officers before the stop compared to cases when their race is not known before the stop.

APD classifies motor vehicle stops based on whether the race of the person stopped was known to the officer prior to the stop. In 2018, Black/African Americans are overrepresented in both Race Not Known and Race Known categories. In the Race Not Known category, Black/African Americans make up 14% of stops (this is a 6% overrepresentation compared to their share of the Austin population). Black/African Americans are further overrepresented when their race is known before the stop, making up 17% of stops in the Race Known category and indicating a 9% overrepresentation when compared to their share of the population.

19. That same 2020 report included two maps of Austin that snapshot the Austin Police Department's approach. The map with red coloring shows the location of vehicle stops that resulted in arrests. The map with yellow coloring shows the location of vehicle stops that resulted in warnings. Austin's East Side has higher concentrations of people of color and the police made more arrests, while Austin's West Side is disproportionally white, and the police gave more warnings:



Map 2 and 3: 2018 Motor Vehicle Stops Resulting in Arrests and Warnings and Field Observations

20. On April 16, 2020, *one week before Officer Taylor killed Mike Ramos*, the City of Austin released a third-party investigative report regarding persistent racist behavior that permeated the Austin Police Department and the almost certain retaliation that employees who dared to speak out must be prepared to endure:

> By several accounts, [Assistant Chief] Newsom's use of racist language was well known throughout the Department as was the use of such language by other officers who were known to be close friends with AC Newsom and used such language openly and often.
>
> Reports came to us, from different ranks, races and genders, advising of the fact that the racist and sexist name calling and use of derogatory terms associated with race and sex persists. Anecdotal history indicated that even members of the executive staff over the years had been known to use racist and sexist language, particularly when around the lower ranks or other subordinates.
>
> We listened to many anecdotes illustrating inappropriate comments over the years through which APD personnel expressed concern about racist behavior, but also sexist behavior, and dissimilar treatment in the handling of officer discipline and those who may be served by APD chaplain services with the denial of marital services to same sex couples. There are some real cultural issues that are in need of attention.
>
> Tatum Law was able to establish that [Austin Police] Chief Manley had reason to inquire as to [Assistant Chief] Newsom's conduct . . . The October 7, 2019, email received by Chief Manley alleging similar facts to those later alleged in the October 30, 2019 complaint about AC Newsom's use of the derogatory term "nigger" in text messages to refer to African Americans provided sufficient information . . . Chief Manley did not send these allegations for review or investigation.

Whether it is about a grievance or misconduct there is an overwhelming sentiment among officers, at or previously involved with the Austin Police Department, and regardless of rank, that an officer, or even civilian staff member, who wishes to right a wrong, complain about improper conduct, or participate in an investigation such as this one, must be prepared in the present climate and culture to face almost certain retaliation, and not necessarily from Chief Manley, directly or solely.

21. The Austin City Council made additional, equally unequivocal findings on June 11, 2020 (*less than a month after Officer Taylor killed Mike Ramos*) regarding the City's anemic and unsuccessful efforts to fix its racist and violent policing culture:

> **The elected members of City Council have no confidence that current Austin Police Department leadership intends to implement the policy and culture changes required to end the disproportionate impact of police violence on Black Americans, Latinx Americans, other nonwhite ethnic communities.**
>
> The measures that current Austin Police Department leadership have been willing to implement are inadequate, and resemble the same flawed police training and command expectations that have existed in the past. [emphasis added].

22. These recent findings by Austin's City Council, Office of Police Oversight, Office of Innovation, and Equity Office are binding evidentiary admissions by the City that its policing policies have led to disproportionate and unconstitutional police violence against members of the Black and Hispanic communities in Austin. Mike Ramos—a mixed race, native Austinite—bridged these two communities and his tragic death is a direct result of the racism that has permeated policing in Austin. It is that much more heartbreaking that he was killed in the same year that City leaders began to admit to—and grapple with—these ingrained problems. Mike's unjustified killing by Officer Taylor emphasizes the urgency of the problem Austin faces.

**V. Claims**

**A. Officer Taylor violated Mike Ramos's Fourth and Fourteenth Amendment rights when he shot and killed Mike without justification.**

23. Ms. Ramos incorporates sections I through V above into her excessive force claim brought under 42 U.S.C. § 1983.

24. Officer Taylor was acting under color of law when he shot Mike Ramos as Mike drove away from police officers. Taylor shot Mike even though Mike did not pose an imminent threat of serious injury or death to anyone that would have justified Taylor's lethal force. Taylor's use of lethal force under these circumstances and considering clearly established law was excessive and objectively unreasonable.

25. Taylor's unlawful and unconstitutional use of deadly force violated Mike's civil rights, is the direct cause of Mike's death, and caused Ms. Ramos's heartbreak and damages.

**B. Austin's policies cause its police to violate the civil rights of Black and Hispanic people including Mike Ramos.**

26. Ms. Ramos incorporates sections I through V.A above into her *Monell* claim brought under 42 U.S.C. § 1983.

27. Austin had these policies, practices, and customs on April 24, 2020:
   a. Disproportionate use of excessive force against people of color,
   b. Condoning such disproportionate use of excessive force against people of color
   c. Choosing not to adequately train officers regarding civil rights protected by the United States Constitution,
   d. Choosing not to adequately supervise officers regarding the use of force against people of color,
   e. Choosing not to intervene to stop excessive force and civil rights violations by its officers,
   f. Choosing not to investigate excessive violence and civil rights violations by its officers, and
   g. Making the deliberate choice not to discipline officers for—and deter officers from—using excessive force and violating civil rights.

28. The City and Brian Manley knew about these policies and required Austin police to comply with them.

29. The City and Brian Manley developed and issued these policing policies with deliberate indifference to Mike Ramos's and other Black and Hispanic Austinites' civil rights.

30. The City and Brian Manley were aware of the obvious consequences of these policies. Implementation of these policies made it predictable that Mike's civil rights would be violated in the manner they were, and the City and Brian Manley knew that was likely to occur.

31. These policies were the moving force behind Taylor's violation of Mike's civil rights and thus, proximately caused Mike's death and Ms. Ramos's damages.

**VI. Damages**

32. Brenda Ramos incorporates sections I through V above into this section on damages.

11

33. Ms. Ramos seeks recovery under the Texas survivorship statute for the damages that Mike would have been entitled to if he had lived including damages for Mike's physical pain and mental anguish and his economic loss.

34. Ms. Ramos also seeks recovery under the Texas wrongful death statute for her own mental anguish and injuries including damages for the loss of her relationship with Mike, her loss of the love, support, and services that Mike would have given to her, economic loss, and funeral and burial expenses.

## VII. Request for jury trial

35. Ms. Ramos requests a jury trial.

## VIII. Prayer

36. For all these reasons, Brenda Ramos requests that the City of Austin and Christopher Taylor be summoned to appear and answer her allegations. After a jury trial regarding her claims, Ms. Ramos seeks to recover the damages listed above in an amount to be determined by the jury and any other relief to which she is entitled including her attorney's fees and expenses under 42 U.S.C. §1988(b), court costs, and pre- and post-judgment interest.

Respectfully submitted,
Hendler Flores Law, PLLC

*/s/ R. Webber*

_____

Rebecca Webber
rwebber@hendlerlaw.com
Scott M. Hendler
shendler@hendlerlaw.com
**HENDLER FLORES LAW, PLLC**
1301 West 25th Street, Suite 400
Austin, Texas 78705
Telephone: 512-439-3202
Facsimile: 512-439-3201

Attorneys for Plaintiff