IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BRENDA RAMOS, ON BEHALF OF HERSELF AND THE ESTATE OF MIKE RAMOS<br>　*Plaintiff*, <br><br>V.<br><br>THE CITY OF AUSTIN AND CHRISTOPHER TAYLOR<br>　*Defendants*. | § § § § § § § § § | No. 1:20-cv-01256-RP<br><br><br>JURY DEMANDED |

**CHRISTOPHER TAYLOR'S ANSWER
TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Defendant, **CHRISTOPHER TAYLOR** (Taylor) by and through his attorneys of record, and files this Answer to Plaintiff **BRENDA RAMOS'S** (Plaintiff Ramos) First Amended Complaint and in support thereof would respectfully show the Court as follows:

### I.   INTRODUCTION

1.   On April 24, 2020, uniformed Officer Christopher Taylor of the Austin Police Department was on patrol near the intersection of E Riverside Drive and Wickersham Lane with his partner Officer Krycia. At around 6:30PM, a suspicious person call was put out via dispatch to the patrol officers of the Austin Police Department. Dispatch advised that a caller had reported that a Hispanic male and female were smoking cocaine and meth in a car parked at the Rosemont Apartments at Oak Valley on 2601 S. Pleasant Valley Drive. The car was described as a gold and black Toyota Prius.

2.      As the call came in from dispatch, Taylor immediately recognized the vehicle description, and determined that this caller was likely reporting the whereabouts of Michael Ramos. Just two hours earlier, APD Officer Cantu-Harkless had briefed Taylor about Ramos at the APD daily shift meeting. At the briefing, Taylor was informed that Ramos was a known violent offender who had—*the night before*—successfully evaded pursuing officers in a vehicle believed to be stolen. Officers at the shift meeting were instructed to be on the lookout for Ramos as a person of interest in *several* recent criminal activities in the area, and were advised that he was suspected of driving a gold Toyota Prius with a black bumper. Two hours later, and equipped with this knowledge, Taylor assigned himself to this suspicious person call.

3.      While Taylor was in the process of notifying dispatch that he would take the call, the dispatcher upgraded the call to "Gun Urgent"—which means that the suspect was reported to be armed and potentially dangerous. Once the call was upgraded, several other officers began to assign themselves to the call, and Officer Cantu-Harkless radioed patrol and confirmed that the call likely involved the same Michael Ramos being searched for by police. Due the serious nature of the call, officers made requests for extensive resources and backup. Officer Krycia requested that APD's police helicopter "AIR1" be deployed to the scene.[1] Another officer requested that a K9 Unit be deployed to the scene.

4.      As Taylor approached the scene in his APD Patrol Vehicle on East Oltorf Street, he observed other officers who had assigned themselves to the call conducting an "approach plan" on the side of the road. Taylor parked and joined to listen to the approach plan. The officers decided that they would conduct a "felony car stop." To effectuate the felony stop and prevent Ramos from escaping again, the officers planned to use their patrol cars to block the only exit out

---

[1] AIR1 was not available to be immediately deployed to the scene.

of the parking lot. Because the suspect was seen holding a woman in the car at gunpoint, the officers determined that they should respond to the scene with their rifles drawn.

5. The officers made their approach down S Pleasant Valley and entered the parking lot of the Rosemont Apartments. Taylor and the other officers immediately identified the distinctive gold and black Prius. The Prius was reverse parked, facing forwards, and nearly directly across from parking lot exit. Having located the vehicle, the officers carried out their felony stop approach plan. Officer Hart arrived on scene first, quickly followed by Officer Cantu-Harkless and Officer Krycia. Officer Cantu-Harkless parked his patrol car almost directly in front of the Prius—canted slightly to the right. Officer Hart parked to the right of Officer Cantu-Harkless. Officer Krycia parked to the right of Officer Hart.

6. Taylor approached in his vehicle behind Officer Krycia and scanned the scene to determine where he could best use his patrol car to block any path Ramos could use to escape in his vehicle. Taylor briefly considered parking his car to the left of Officer Cantu-Harkness's patrol car on the raised grassy median, but decided against it after observing a rock in the median that would inhibit his ability to park on the grass. Simultaneously, Taylor observed that Ramos had no avenue to escape in his car to his right, because a parking lot full of cars blocked access to the street and because the parking lot reached a dead end at a large municipal dumpster.

7. Accordingly, Taylor parked his patrol car behind the other officers, exited, and took up a position on the passenger side of Officer Cantu-Harkless's patrol car with his rifle braced on the passenger side mirror. Immediately, Taylor observed that the Prius was a mere ten feet—or approximately one car length—away from the front of Officer Cantu-Harkless's patrol car.

8. Once positioned, Taylor could see a male in the driver's seat of the Prius and a female in the passenger seat who matched the report from dispatch. Officer Cantu-Harkless and Officer

Hart began to give numerous commands to the driver and the passenger to keep their hands up and visible. The driver slowly opened his door. Officer Cantu-Harkless then positively identified the searched-for Michael Ramos, and issued commands to step out of the vehicle. Ramos stepped out with his hands up and appeared to be complying with commands. Officer Cantu-Harkless commanded Ramos to lift up his shirt so that the officers on scene could see if Ramos had a gun in his waistband. Again, Ramos complied and made a quick movement that lifted up his shirt—allowing Taylor and the other officers to see if the reported gun was in his front waistband.

9.      Officer Cantu-Harkless commanded Ramos to slowly turn around in a circle so that Taylor and the other officers could see if the reported gun was tucked into the back of his waistband. Ramos again complied, but Ramos made the decision to simultaneously walk back towards the driver's side door of the Prius. Ramos's decision to walk back towards the driver's door alarmed Taylor, and made him suspect that Ramos was considering getting back in the Prius. Taylor yelled for Ramos to "come towards us!" Officer Cantu-Harkless repeated this command seconds later, saying, "Michael Ramos, you are going to get impacted[2] if you don't listen, walk towards me." Michael Ramos replied by saying "what the fuck," and refused to comply with the commands issued to him. Taylor also noticed Ramos casting his gaze around the scene, and believed Ramos was potentially stalling and looking for an avenue of escape.

10.     With Ramos demonstrating clear non-compliance—including by refusing to step away from the Prius—Taylor called out to his fellow officers "do we have a less lethal?" Taylor believed the situation potentially needed to be deescalated with a less lethal option *before* Ramos got back into the Prius—where the gun reported by dispatch might be hidden. Taylor also knew that, with APD officers blocking the only motor vehicle exit, if Ramos got back into his vehicle,

---

[2] Referring to a less than lethal projectiles.

*Defendant Christopher Taylor's 1st Amended Answer*                                                                   Page 4

***the only possible way Ramos could flee the scene was by driving toward him and his fellow APD officers***.

11.     Officer Mitchell Pieper then walked up behind Taylor and Officer Hart, and declared that he possessed the "less lethal" shotgun.[3] Still fearing Ramos's reported gun or a dangerous flight attempt, Taylor immediately called out for Officer Pieper to "move up" so that he could be ready to impact Ramos.[4]  By now, Ramos was leaning up against the side of the Prius driver's side door and continued to take small furtive steps towards its interior. Officer Hart similarly called for Officer Pieper to "go with it" and be prepared to impact Ramos. All the while, Ramos continued his movements toward the Prius, and had now placed the driver's door in-between himself and the APD officers. Officers called out "don't go back [to the car]" and Taylor called out to Officer Pieper "impact up, impact up," while Officer Hart also called out "impact up, get it ready."

12.     Unfortunately, Ramos's position behind the car door deprived Officer Pieper of an angle to use the less lethal rounds to deescalate the situation, and Officer Pieper advised, "I can't, I don't have an angle, I'm going to have to go to the right." Taylor, still trying to deescalate the situation, told Officer Pieper to "take a deep breath, and reposition to the right side of that car." As Officer Pieper repositioned, Officer Cantu-Harkless loudly commanded Ramos to "get on your knees." Michael Ramos responded, "what the fuck you trippin' on, dog" and refused to comply. Simultaneously, Officer Taylor and several other officers yelled out "impact him" to gain control of the scene.

---

[3] Less lethal options have been shown to reduce the likelihood of serious injuries compared to alternative force options. *See* John M. MacDonald, PhD, *The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events*, AM J. PUBLIC HEALTH, (Dec. 2009) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2775771/.

[4] "Impact" in this context is a verb used to describe discharging a less lethal round at a suspect.

13.     Officer Pieper, now repositioned farther to the right, screamed, "walk towards us or I'm going to impact you!" Michael Ramos shouted, "[i]mpact me? For what?" Officer Pieper yelled, "walk towards us! Comply with us! Comply with us!" Ramos remained where he was, non-compliant. Officer Pieper screamed, "impacting!" and hit Michael Ramos with a less lethal round in the left thigh.

14.     Taylor saw the less lethal round hit Ramos, and saw a furious looking Ramos *immediately* get back into the Prius—despite officer's screaming at him to "get out of the car."[5] Taylor, *now closely watching Ramos*, saw Ramos lean forward and reach down toward the floorboard of the car. At that moment, Taylor believed Michael Ramos was reaching for a gun, and prepared himself. As Ramos sat up straight in the driver seat, Taylor did not see a gun, but instead saw Ramos shift the vehicle into drive.

15.     In mere seconds, Taylor had to synthesize and consider the facts that: (1) Ramos had a history of violence; (2) APD had been called to the scene because Ramos was reported to have held a woman at gunpoint; (3) Ramos had successfully fled from police the night before; (4) Ramos was potentially high on cocaine and/or methamphetamine; and (5) Ramos was actively non-compliant and verbally confrontational; and (6) Ramos's only plausible avenue of escape in his vehicle *was to drive through—and over—him or his fellow APD officers*.  Thus, APD Officer Christopher Taylor reasonably believed at that moment that Michael Ramos had just armed himself with a deadly weapon—his vehicle—and that Ramos was an individual that would plausibly run over him or his fellow police officers in his desperation to escape custody.

16.     Taylor further reasonably believed that he and his fellow APD officers were in direct danger due to their proximity to Ramos's projected path of escape, because the Prius was reverse parked and facing directly towards the officers positioned on the left side of Officer Cantu-

---

[5] By this moment the female passenger had fled from the car.

Harkless's patrol car. Taylor also knew that because the Prius was merely one car length away, he would only have a split second to react if Ramos accelerated the car forward to escape. Due to the extremely short distance between the nearby police officers and the Prius, ***Taylor knew that any hesitation to act on his part could result in serious injury or death for the nearby police officers. His decision was thus limited to two options: either to act immediately, or to not act at all and risk his fellow officer's lives.*** Unfortunately, Ramos made the decision to drive forward to flee. When he did, Officer Taylor—in the split-second available to him—chose the option that he believed was necessary to save his fellow officers' lives.

## II.   FIRST AMENDED ANSWER

17.   With respect to Paragraph 1 of Plaintiff Ramos's First Amended Complaint, Taylor admits that he has been sued for the shooting death of Ramos on April 24, 2020. Taylor denies that he knew Ramos did not have a gun at the moment he made the decision to shoot. Taylor further denies that Ramos was "unarmed" as Ramos had armed himself with a vehicle—a deadly weapon.[6]

18.   With respect to Paragraph 2 of Plaintiff Ramos's First Amended Complaint, Taylor admits that cell phone video and police video captured the incident, the contents of which speak for themselves. Taylor denies that the Austin Police Department "dehumanizes" the citizens it serves.

19.   With respect to Paragraph 3 of Plaintiff Ramos's First Amended Complaint, Taylor denies that his fears were irrational for the reasons stated herein. Taylor denies that he violated Ramos's civil rights.

---

[6] *See* TEX. PEN. CODE § 1.07 (17)(B) ("Deadly weapon means: anything that in the manner of its use or intended use is capable of causing death or serious bodily injury"); *see also Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005) ("A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury.") (citations omitted).

20. With respect to Paragraph 4 of Plaintiff Ramos's First Amended Complaint, Taylor admits that Ramos has sued him and the City of Austin. Taylor denies that he was "unjustified" in taking the actions he did.

21. With respect to Paragraph 5 of Plaintiff Ramos's First Amended Complaint, Taylor has no knowledge of the stated events.

22. With respect to Paragraph 6 of Plaintiff Ramos's First Amended Complaint, admit.

23. With respect to Paragraph 7 of Plaintiff Ramos's First Amended Complaint, Taylor admits he was an Austin police officer at the time of the incident.

24. With respect to Paragraphs 8 – 11 of Plaintiff Ramos's First Amended, admit.

25. With respect to Paragraph 12 of Plaintiff Ramos's First Amended Complaint, Taylor denies that he shot Ramos without justification. Further, Taylor denies that he or any other APD officer at the scene could have known Ramos did not have a gun until they arrested him and searched the Prius. Taylor denies any insinuation by Plaintiff that he or any APD officer at the scene of the incident had reason to believe Ramos was being "swatted." Taylor admits that a caller reported a suspicious person with a gun matching Ramos's description. The recorded contents of the 911 call to dispatch speak for itself.

26. With respect to Paragraph 13 of Plaintiff Ramos's First Amended Complaint, Taylor admits that former APD Chief Brian Manley gave numerous recorded statements to the press about this incident, the contents of which speak for itself. Taylor denies Ramos's assertion in footnote seven that APD's decision to block Ramos's only exit avenue for his vehicle with police personnel and patrol cars means that Taylor irrationally believed Ramos intended to use the Prius as a deadly weapon to escape. This assertion rests on a logical fallacy. Rather, if APD personnel are blocking the ***only escape for a vehicle***, then any attempt to escape with a vehicle would be

inherently dangerous because Ramos's only escape plan would have involved driving through APD officers.

27. With respect to Paragraph 14 of Plaintiff Ramos's First Amended Complaint, Taylor admits that Chief Manley made a report to the Attorney General. Taylor admits that numerous officers were shouting commands at Ramos, but Taylor denies these orders were conflicting. All officers were essentially commanding Ramos to come towards them with his hands up. It was only after Ramos moved back towards the Prius that officers began telling him to get on his knees. Taylor admits that the video recordings captured audio of officer commands, the contents of which speak for themselves. Taylor admits that Ramos was verbally combative and insisted that the officers disarm. Taylor denies Plaintiff's assertion in footnote eight that it is "confounding" that officers desired to use less lethal force to deescalate the situation. Taylor also denies Plaintiff's footnoted insinuation that Ramos was complying with officer commands, or that the officers could have known that Ramos did not have a gun in the Prius, or somewhere else on his person other than his waistband. The 911 call gave any reasonable police officer sufficient reason to fear that Ramos was in possession of a gun.

28. With respect to Paragraph 15 of Plaintiff Ramos's First Amended Complaint, Taylor denies Ramos was not an ongoing threat to officer safety. Officers had reason to fear that Ramos had a gun in the car, and had personally observed Ramos being verbally combative, non-compliant, and continuously making furtive movements back towards the open car door. Taylor denies Plaintiff's characterization that Ramos "simply" got back in his car. Ramos took this action after a less lethal means of subdual failed, and officers had every reason to believe that Ramos got back into his car with the intention to flee the scene or retrieve a firearm. Taylor

further denies Plaintiff's characterization of Ramos's driving behavior. Taylor admits that he never saw a gun in Ramos's possession. Taylor admits that Ramos was shot in the head.

29. With respect to Paragraph 16 of Plaintiff Ramos's First Amended Complaint, Taylor has no knowledge of the 2016 study referenced by Ramos. Taylor denies that he has witnessed actions by City of Austin officials that lead him to suspect the City has a policy or custom of institutional racism in policing.

30. With respect to Paragraph 17 of Plaintiff Ramos's First Amended Complaint, Taylor recalls hearing about these statements by the Austin City Counsel indirectly. Taylor denies that he has witnessed actions by Austin Police Department officers that lead him to suspect the Department has a policy or custom of institutional racism in policing.

31. With respect to Paragraph 18 – 19 of Plaintiff Ramos's First Amended Complaint, Taylor recalls that he was made aware of this report. Taylor denies that he has witnessed actions by Austin Police Department officers that lead him to suspect the Department has a policy or custom of institutional racism in policing.

32. With respect to Paragraph 20 of Plaintiff Ramos's First Amended Complaint, Taylor admits he has seen officers use foul language, but denies direct knowledge of the specific behavior referenced by Plaintiff Ramos. Taylor admits that he was made aware of the general nature of the independent investigator's report. Otherwise, denied.

33. With respect to Paragraph 21 of Plaintiff Ramos's First Amended Complaint, ***Taylor denies that race had anything to do with his decision to use deadly force against Ramos.*** Taylor denies that the decision to use deadly force against Ramos was unjustified for the reasons stated herein. Taylor denies that he has witnessed actions by APD officers or City Officials that lead him to suspect the City of Austin has a custom or policy of institutional racism.

34. With respect to Paragraph 22 of Plaintiff Ramos's First Amended Complaint, Taylor has no direct knowledge of these recent studies referenced by Ramos. Taylor denies that he witnessed any behavior or curriculum in the Academy that "inculcated or indoctrinated" him or any of his fellow cadets into a racist policing culture.

35. With respect to Paragraph 23 of Plaintiff Ramos's First Amended Complaint, Taylor denies that he was unjustified in using deadly force against Ramos for the reasons stated herein. Taylor again further denies that Ramos's race had anything to do with Taylor's decision to use deadly force against Ramos. Otherwise, denied.

36. With respect to Paragraphs 24 – 26 of Plaintiff Ramos's First Amended Complaint, Taylor admits he was acting under color of law when he made the decision to shoot Ramos. Taylor denies that he observed Ramos driving away from APD officers when he made the decision to shoot. Taylor denies that he did not reasonably believe that Ramos posed an immediate threat of serious injury or death to his fellow APD officers. Taylor denies Ramos's assertion that the use of lethal force was not justified under the law within the Fifth Circuit or the Supreme Court of the United States, and further denies that the law clearly established that his conduct was unconstitutional. Otherwise, denied.

37. With respect to Paragraphs 27 – 31 of Plaintiff Ramos's First Amended Complaint, Taylor denies that he has witnessed behavior to the extent that leads him to believe that the City of Austin has a custom or policy of: (1) racism in policing; (2) inadequate training as to a citizen's constitutional rights; (3) inadequate supervision of officers; (4) failing to intervene to stop excessive force; (5) failing to investigate allegations of excessive force; or (6) failing to punish excessive force. Taylor further denies that he was unjustified in using force against the

individual referenced by Ramos in Paragraph 29, or that former Chief of Police Brian Manley or his agents unreasonably "cleared" his actions related to this incident. Otherwise, denied.

38. With respect to Paragraph 32 of Plaintiff Ramos's First Amended Complaint, Taylor denies that Ramos's civil rights were violated, and further denies that his actions were taken pursuant to an impermissible or unconstitutional City custom or policy.

39. With respect to Paragraphs 33 – 35 of Plaintiff Ramos's First Amended Complaint, Taylor denies Plaintiff Ramos is entitled to any recovery against him for her alleged damage model.

### III.   JURY DEMAND

40. Defendant Christopher Taylor demands a jury trial.

### IV.   AFFIRMATIVE DEFENSES & IMMUNITIES

41. Taylor files this Answer subject to his pending motion to dismiss Plaintiff's First Amended Complaint.

42. Taylor denies any deprivation under color of statute, ordinance, custom, or abuses of any rights, privileges, or immunities secured to Ramos by the United States Constitution, state law, or 42 U.S.C. § 1983, *et seq*.

43. Taylor hereby invokes the doctrine of qualified and official immunity, and asserts he discharged his obligations and public duties in good faith, and would show that his actions were objectively reasonable in light of the law and with the information possessed at that time.

44. The incident in question and the resulting harm to Ramos were caused or contributed to by Ramos's own illegal conduct.

45. Pleading further, alternatively, and by way of affirmative defense, Taylor would show that at the time and on the occasion in question, Ramos failed to use ***any*** degree of care or

caution that a person of ordinary prudence would have used under the same or similar circumstances, and that such failure was the producing cause or the sole proximate cause of the incident in question and the alleged damages that arise therefrom. Taylor invokes the comparative responsibility provisions of the Texas Civil Practice & Remedies Code.[7]

46.     Taylor further pleads that in the unlikely event that any liability is found on the part of Taylor, that such liability be reduced by the percentage of the causation found to have resulted from the acts or omissions of Ramos.

47.     Taylor pleads that he had legal justification for each and every action taken by him relating to this incident.

48.     Taylor asserts the limitations and protections of Chapter 41 of the Texas Civil Practice & Remedies Code, and the due process clause of the United States Constitution.

49.     Taylor asserts the limitations and protections of Chapter 101 of the Texas Civil Practice & Remedies Code.

## V.   PRAYER

50.     WHEREFORE, PREMISES CONSIDERED, Defendant Christopher Taylor prays that upon a final hearing of this cause that the Court enter judgment that Plaintiff Ramos take nothing by this suit against Taylor, that all costs of court be assessed against Plaintiff, and for all further relief Taylor is entitled to in either law or equity.

---

[7] *See* TEX. CIV. PRAC & REM. CODE ANN. § 33.001.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
900 Congress Avenue, Suite 500
Austin, Texas 78701
512-476-4600
512-476-5382 – Fax

By:      /s/ Stephen B. Barron
      Blair J. Leake
      State Bar No. 24081630
      bleake@w-g.com
      Stephen B. Barron
      State Bar No. 24109619
      sbarron@w-g.com
      Archie Carl Pierce
      State Bar No. 15991500
      cpierce@w-g.com

**ATTORNEYS FOR DEFENDANT CHRISTOPHER TAYLOR**

### CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of April 2021, a copy of Defendant Taylor's First Amended Answer to Plaintiff's Complaint was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorneys of record:

Rebecca Ruth Webber
rwebber@hendlerlaw.com
Scott M. Hendler
shendler@hendlerlaw.com
HENDLER FLORES LAW, PLLC
1301 West 25th Street, Suite 400
Austin, Texas 78705

H. Gray Laird
Assistant City Attorney
Gray.laird@austintexas.gov
City of Austin – Law Department
P.O. Box 1546
Austin, Texas 78767-1546

   /s/ Stephen B. Barron

Stephen B. Barron