IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

BRENDA RAMOS, *on behalf of herself and the*     §
*Estate of Mike Ramos*,     §
    §
          Plaintiff,     §
    §
v.     §     1:20-CV-1256-RP
    §
CHRISTOPHER TAYLOR and     §
THE CITY OF AUSTIN,     §
    §
          Defendants.     §

## ORDER

Before the Court is a motion to dismiss filed by Defendant City of Austin ("City of Austin" or "the City"), (Dkt. 47), a motion to dismiss filed by Defendant Christopher Taylor ("Taylor"), (Dkt. 49), and a motion to strike filed by Plaintiff Brenda Ramos ("Plaintiff"), (Dkt. 66). Having considered the parties' briefs, the record, and the relevant law, the Court will deny Taylor's motion to dismiss, moot Plaintiff's motion to strike, and grant the City's motion in part and deny the motion in part.

## I. BACKGROUND

This case arises out of the April 24, 2020, police shooting of Mike Ramos ("Ramos"), a Black and Hispanic resident of Austin. His mother, Brenda Ramos, brought suit against the City of Austin and Austin Police Department ("APD") Officer Christopher Taylor, (2d. Am. Compl., Dkt. 45), and alleges the following facts:

On April 24, 2022, APD received a muffled, partially unintelligible 911 call reporting two Hispanic people in a car at the Rosemont Apartments at 2601 South Pleasant Valley Road, Austin, Texas. (*Id.* at 2). The operator struggled to understand the caller, whose audio was garbled and sounded as though she was pulling away the phone (*Id.* at 3). The caller stated that the man in the

car was armed, but after repeated questions from the police, the caller clarified that the man in the car was simply holding a gun, not pointing it at anyone. (*Id.*).

Plaintiff alleges that APD should have recognized several factors that made the call suspect. The story changed, there was no threat of imminent harm to anyone, and the description of the people in the vehicles did not match what Ramos was actually wearing when officers arrived. (*Id.* at 4). Plaintiff claims it was a swatting incident—where a caller deliberately reports a fictitious emergency so that police respond and frighten the victims. (*Id.* at 3). Despite the allegedly suspect nature of the call, APD mobilized seven officers, including Defendant Christopher Taylor, to the scene, along with a police helicopter and dog. (*Id.* at 4). The police arrived on the scene and several officers, including Taylor, were armed with semi-automatic rifles. (*Id.*). They blocked the entrance to the parking lots and enclosed the space around Ramos's Toyota Prius. (*Id.*). They then confirmed that Ramos did not have a weapon in his hand or on his person. (*Id.*).

According to the complaint, the officers then got out of their vehicles and aimed their rifles at Ramos and his companion in the Prius. (*Id.* at 5). Taylor was in the center of the cars, aiming his rifle at Ramos. (*Id.*).  Officer Pieper, who was still in field training, had previously been told to stay in the car. (*Id.* at 10). However, at the scene, he got out of the vehicle and aimed a firearm at Taylor loaded with "less lethal" rounds. (*Id.*). The officers commanded Ramos to step out of the car. Ramos complied immediately. (*Id.* at 5). He got out of the car with his hands up. (*Id.* at 6). At that point, it was clear that he did not match the description of that the caller had given as he was wearing a different colored shirt and did not have a gun. (*Id.*). Ramos turned around at the direction of the police to show them that he did not have a handgun. (*Id.*).

At that point, according to the complaint, the situation escalated. The police began shouting conflicting commands at Ramos, all while pointing their rifles at him. (*Id.* at 7). The police did not explain why Ramos had been surrounded. (*Id.*). They did not explain why they pointed semi-

automatic rifles at him. (*Id.*). Ramos repeatedly asked with the police officers to explain what was going on, stating, "What's going on? What's going on?" (*Id.* at 8). As stated in the complaint, he plead with them, "Put the guns down, dawg. What the fuck is going on? Why? What the fuck? You're scaring the fuck out of me?" (*Id.*). In response, Officer Cantu-Harkless said, "I can't explain right now Mike." (*Id.* at 9).

The officers once again shouted allegedly conflicting commands. One told him to keep his hands up, another to walk forward, another to turn around in a circle, and another to get on his knees. (*Id.* at 10). Ramos stayed with his hands up, and Taylor began to order the trainee Pieper to "move up" and "impact up." (*Id.* at 11). Pieper shouted, "comply with us!" (*Id.*).

Ramos pleaded with them again. "Impact me for what? Put the gun down dawg. Man, what the fuck dawg?" (*Id.*). Taylor and other officers ordered Pieper to shoot Ramos with a less lethal projectile. (*Id.*). Pieper shot Ramos with his hands in the air above his head. (*Id.*). The complaint notes that bystanders began to shout, wondering why the police shot him. (*Id.* at 12). In reaction, Ramos entered his car, as his companion left the passenger side. (*Id.* at 15). Ramos began to drive away. He drove towards the dead end blocked by dumpsters, away from Taylor and the officers (*Id.*).

According to the complaint, Taylor opened fire as the car drove away. (*Id.*) Neither Taylor nor any other officer were in front of the Prius nor in the direction it was facing. (*Id.* at 16). Taylor fired from behind his police cruiser, standing at the passenger side door. (*Id.*). Bystanders began to yell, "Why you shootin him?" and "Why you murdering this man?" (*Id.*). Only Taylor, and no other officers, had fired their lethal weapons. (*Id.* at 18). He fired three shots at Ramos, who died of a gunshot to the back of his head. (*Id.* at 17).

Plaintiff filed her second amended complaint on March 15, 2022. She brings claims under Section 1983 for violating Ramos's Fourth Amendment rights, based on both the allegedly unwarranted and unreasonable killing of Ramos, as well as the discriminatory practices of the APD

more generally. In her complaint, she alleges that APD has systemically targeted Black and Hispanic neighborhoods. (*Id.* at 20). The complaint cites a 2016 study that APD officers use more violence in Black and Hispanic neighborhoods and are more likely to use severe force against Black people. (*Id.*). APD officers were also found to be more likely to shoot Black suspects rather than using hand-to-hand training. The complaint also cites a report from an Austin oversight office which highlights the disproportionate policing practices of APD. (*Id.* at 21–22). According to Plaintiff, these practices show a consistently racist and discriminatory pattern of behavior from APD officers.

In addition to APD's allegedly disproportionate policing of communities of color, Plaintiff claims that APD trained its officers in a "paramilitary" style, emphasizing conflict over de-escalation. (*Id.* at 19). She states that the City itself shut down its training academy after Ramos's shooting in order to transition from a "military-styled Academy" into one with a stronger emphasis on de-escalation and communication skills. (*Id.* at 19–20). Finally, Plaintiff alleges that the City failed to adequately discipline its officers, especially Taylor, for excessive use of violence. Plaintiff contends that Taylor has been involved in unwarranted shootings of civilians before and has not been punished by APD for either incident. (*Id.* at 18–19). Plaintiff argues that the City has failed to investigate violence and made a deliberate choice not to discipline officers from using excessive force.

Defendants City of Austin and Christopher Taylor filed separate motions to dismiss. (Dkts. 47, 49). The City alleges that Plaintiff has failed to plead a policy or practice of violence by APD personnel against Black and Hispanic residents. (City's Mot. Dismiss, Dkt. 47, at 2–5). The City also alleges that Plaintiff has failed to plead specific, non-conclusory facts that would support a failure to train or supervise or implement inadequate disciplinary policies. (*Id.* at 5–11).

Taylor's Motion to Dismiss, filed on April 12, 2022, argues that he is entitled to qualified immunity, and that Plaintiff has not plead facts which show Taylor's actions were clearly

unreasonable. (Taylor's Mot. Dismiss, Dkt. 49, at 7). He argues that both the temporal and physical proximity to Ramos placed him in reasonable fear of being hit by the Prius. (*Id.* at 7–11).

In support of his argument, Taylor relies on three video exhibits. The videos are a screen recording of YouTube videos provided by the City that show dashcam and bodycam videos of the events leading up to and including Ramos's death. (*Id.* at 5–6). Ramos filed a motion to strike these video exhibits on June 8, 2022. (Mot. Strike, Dkt. 66). Taylor responded by arguing that the motion to strike should be denied as untimely. (Resp., Dkt. 67).

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the

complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

As a preliminary matter, the Court will discuss whether the videos offered by Taylor are admissible at this stage of the litigation. The Court will then turn to Taylor's motion to dismiss, before addressing the City's motion.

### A. Video Exhibits

Defendant Taylor provides three videos as attachments to his motion to dismiss. Collectively, these videos include helicopter footage of the scene, dashcam video of the shooting, and a "Critical Incident Briefing" provided by the City of Austin that provides police commentary on the footage of the shooting. (Exhs., Dkt. 49). Taylor argues that these videos are incorporated by reference in Plaintiff's complaint, and are thus admissible at the motion to dismiss stage. (Mot. Dismiss, Dkt. 49, at 5–6).

The general rule is that courts should consider a motion to dismiss based on the four-corners of the plaintiff's pleadings, not the evidence that Defendants may seek to introduce in response. *See Villarreal v. Wells Fargo Bank, N.A.,* 814 F.3d 763, 766 (5th Cir. 2016) ("A district court

is limited to considering the contents of the pleadings and the attachments thereto when deciding a motion to dismiss under Rule 12(b)(6)."); *see also Indest v. Freeman Decorating*, Inc., 164 F.3d 258, 261 (5th Cir. 1999) ("We may not look beyond the pleadings."). However, the Court may consider "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim." *Villarreal*, 814 F.3d at 766 (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir.2000)). This Court has held that "a court may consider video evidence attached as an exhibit to the complaint." *Scott v. White*, No. 1:16-CV-1287-RP, 2018 WL 2014093 at *1 (W.D. Tex. Apr. 30, 2018) (citing *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017)).

Defendant's video exhibits are not attached to Plaintiff's complaint. The helicopter video is not referenced in Plaintiff's complaint, much less attached. The dashcam footage may overlap slightly with certain photos that are included in the complaint, but the video itself is not attached (*See* 2d. Am. Compl., Dkt. 45, at 13). Defendant's third video, which is the APD Community Briefing, is referenced in a footnote that hyperlinks to a site which has the YouTube video embedded. (*Id.* at 17 n.9). A hyperlink to a webpage does not qualify as an attached document, so there is no indication that Taylor's videos are attached to the complaint. *See Cantu v. Austin Police Dep't*, No. 1:21-CV-00084-LY-SH, 2021 WL 5599648 at *4 (W.D. Tex. filed Nov. 30, 2021), *report and recommendation adopted*, No. 1:21-CV-84-LY, 2022 WL 501719 (W.D. Tex. filed Jan. 24, 2022) ("Merely providing a web address or hyperlink is insufficient to submit documents to the Court or make them of record.").

Nor do the attached videos meet the standard set out in *Villareal*. Plaintiff *does* reference the videos in her footnote, but this is for the express purpose of criticizing the accuracy of the video. (*Id.*). Plaintiff notes that the "videos that are currently available publicly appear to have been edited by APD" and that "the timestamps are inconsistent, some by more than 3 seconds and one by more

than 5 minutes." (*Id.*). In as much as this is a "reference" to Defendant's videos, it is only to criticize the videos' accuracy. There mere fact that Defendant criticized a potential piece of evidence's reliability does not automatically make that evidence admissible.

Nor are Defendant's videos central to Plaintiff's claim. In general, in Fifth Circuit cases where the court considers evidence at the motion to dismiss stage, the use of such evidence is uncontested. Often, the evidence is "central" to the claim in that it is a written instrument at the heart of a dispute, as permitted by Rule 10(c), such as a contract or lien. *See* Fed. R. Civ. P 10(c).  In *Collins*, this included financial statements core to the plaintiff's claim, which the plaintiff did not object to. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). In *Villareal*, the evidence at question was a notice of foreclosure that was expressly referenced in the pleadings and central to the plaintiff's claims. *Villarreal v. Wells Fargo Bank, N.A.*, No. 7:14-CV-584, 2014 WL 12600167 at *4 n.7 (S.D. Tex. Sept. 15, 2014), *aff'd*, 814 F.3d 763 (5th Cir. 2016). Taylor's videos are categorically distinct from these written instruments, as they are not central to the complaint itself, but merely depict evidence of the incident in question.

In at least two other cases, district courts within the Fifth Circuit have declined to consider videos of police violence at the motion to dismiss stage. In one case, the Eastern District of Texas declined to consider evidence such as a 911 call and body camera footage at the motion to dismiss stage because the references to the videos were insufficient. *Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 325 (E.D. Tex. 2021). Moreover, the court noted that it would be inappropriate to take judicial notice of the facts within the call. *Id.* Likewise, this Court has declined to take judicial notice of a police video, noting that it "clearly exceeds the purview of judicial notice.*" Ambler v. Williamson Cnty., Texas*, No. 1-20-CV-1068-LY, 2021 WL 769667 (W.D. Tex. Feb. 25, 2021) (Order, Dkt. 25) (Hightower, J.). Most importantly, *Ambler* noted that the mere fact that the video captured events at issue in the complaint does not render it "referenced" as a matter of evidence. (*Id.* at 3).

District courts outside the Fifth Circuit have also declined to consider videos of police conduct at the motion to dismiss stage. *See Turner v. Byer*, No. 2:17-CV-1869-EFB P, 2020 WL 5518401, at *1 (E.D. Cal. Sept. 14, 2020) ("As plaintiff points out, the video is not part of the complaint and thus is extrinsic material not properly considered in determining whether the allegations of the complaint are sufficient to state a claim for relief."), *R. & R. adopted*, 2020 WL 6582267 (E.D. Cal. Nov. 10, 2020); *Smith v. City of Greensboro*, No. 1:19CV386, 2020 WL 1452114, at *3 (M.D.N.C. Mar. 25, 2020) (finding that a police camera video attached to defendant's motion to dismiss was not central to plaintiff's complaint where complaint made "no express mention of the video"). As one district court noted, "Simply because a video that captured the events complained of in the complaint exists does not transform that video into a 'document' upon which the complaint is based." *Slippi-Mensah v. Mills*, No. 1:15-CV-07750-NLH-JS, 2016 WL 4820617, at *3 (D.N.J. Sept. 14, 2016).

Taylor's videos are nearly identical to those that this Court struck in *Ambler* in that they are only one perspective of the shooting. As this Court noted in *Ambler*, "the Video captures only part of the underlying incident." *Ambler*, 2021 WL 769667, at *4. Indeed, in this instance, at least one bystander also captured video of the event, whose video Taylor does not seek to include. (2d. Am. Compl., Dkt. 45, at 14). Given that multiple perspectives exist of this same incident, the Court sees no reason to deviate from *Ambler*'s holding declining to consider video evidence at the motion to dismiss stage.

Instead, Defendants rely on another case from this Court involving police violence—*Scott v. White*, No. 1:16-CV-1287-RP, 2018 WL 2014093 at *1 (W.D. Tex. Apr. 30, 2018) (Order, Dkt. 60, at 11). However, in that case, the Plaintiff attached dashcam footage of the incident to his complaint. (*Id*). Indeed, the video was marked as "Exhibit A." *Scott v. White*, No. 1:16-CV-1287-RP (3d. Am. Compl., Dkt. 64, at 5). Notably, in *Scott*, the plaintiff made no attempt to criticize the video or

suggest that they were inaccurate. Far from criticizing the videos, the plaintiff relied on them repeatedly in his complaint. (*Id*.). Thus, *Scott* can be readily differentiated from the instant case, both because this case presents a genuine dispute as to the accuracy of the evidence, as well as the fact that the Plaintiff has not voluntarily relied on the video evidence. The fact that a video may be central to Taylor's defense does not mean that it is central to the Plaintiff's claims. *Ambler*, 2021 WL 769667, at *4.

Finally, even if the videos were sufficiently referenced by Plaintiff, they would nonetheless be inadmissible for a Rule 12 motion. Taylor does not cite any instances in which a court has considered extrinsic evidence that the plaintiff plausibly argues has been edited. Indeed, Taylor cites several cases which stand for the opposite proposition—that courts deciding a motion to dismiss should only consider extrinsic evidence when its authenticity is uncontested. (Taylor's Mot. Dismiss, Dkt. 49, at 5 n.18 (citing *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (per curiam) ("court[s] may take into account documents . . . whose authenticity is unquestioned."))). Likewise, Taylor cites another case for the proposition that a court should "not adopt a plaintiff's characterization of the facts where *unaltered* video evidence contradicts that account." (*Id.* at 6 (citing *Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014) (emphasis added)). As these cases make clear, video evidence at a motion to dismiss stage must have unquestioned authenticity and be "unaltered." Here, neither is the case. The videos attached by Taylor are not the authentic, original video files. (Exhs., Dkt. 49). Instead, they are screen-recordings of the YouTube videos themselves. Because Taylor's defense deal with the exact timing of when the bullets were fired and the minute details of the scene, such as whether Ramos may have been blinded by the sunlight, it is important to authenticate any video exhibits prior to considering them. Moreover, Plaintiff has plausibly alleged, at least at the motion to dismiss stage, that the City altered the videos which Taylor includes. As Plaintiff points out, the various videos' timestamps are inconsistent by several seconds. (2d. Am.

Compl., Dkt. 45, at 17 n.9). Only certain videos are available, and the footage from three other officers has not been provided. (*Id.*). Plaintiff has plausibly alleged that these videos have been altered, and, at the very least, do not contain all APD perspectives of the event. (*Id.*). In light of this allegation, it would be premature to introduce Taylor's exhibits into evidence prior to discovery that will presumably reveal the full, unaltered video evidence. Accordingly, the Court declines to consider Taylor's video exhibits at this stage of the pleading.[1]

### B. Taylor's Motion to Dismiss

Having found that Taylor's video exhibits are inadmissible, the Court turns to Taylor's motion to dismiss itself. In his defense, Taylor asserts that he is entitled to qualified immunity, and that Plaintiff's complaint does not meet the high burden needed to show a clearly unreasonable use of excessive force. (Taylor's Mot. Dismiss, Dkt. 49). He further contends that no clearly established law supports liability for a "blink of an eye" decision, relying especially on a recent Fifth Circuit case involving police shooting a moving vehicle (*Id.* at 13 (citing *Irwin v. Santiago*, 21-10020, 2021 WL 4932988 (5th Cir. Oct. 21, 2021) (unpublished))).

At this early stage of the litigation, the Court does not need to delve into the contested facts of Taylor's actions in the moments before Ramos's death. Instead, the relevant inquiry remains whether the complaint states a valid, plausible claim when viewed in the light most favorable to the Plaintiff. *Iqbal*, 556 U.S. at 678–79 (2009). At the motion to dismiss stage, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness'." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (emphasis in original). Moreover, "[i]n showing that the defendant's actions violated clearly established law, the plaintiff need not rebut every conceivable

---

[1] Plaintiff contested the use of the video exhibits in her response to Taylor's motion to dismiss. (P's Resp., Dkt. 56), and later filed a motion to strike the exhibits (Mot. Strike, Dkt. 66). These two filings contain largely the same arguments, so the Court need not decide whether the motion to strike was timely filed, since, as a preliminary matter, the video exhibits do not qualify as evidence properly before the Court at this stage.

reason that the defendant would be entitled to qualified immunity, including those not raised by the defendant." *Cotropia v. Chapman*, 721 F. App'x 354, 360 (5th Cir. 2018) (per curiam).

"To prove an excessive-force claim, a plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *See Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (cleaned up); *Hathaway v. Bazany*, 507 F.3d 312, 321 (5th Cir. 2007). As the Fifth Circuit has noted, however, qualified immunity claims often involve intensive inquiries into the facts of the case. *Id.* ("Excessive-force claims are necessarily fact-intensive . . . .") (internal citations omitted). Taylor repeatedly urges the Court to examine the detailed facts of what happened during the incident in question, (Taylor's Mot. Dismiss, Dkt. 49 at 4–15), but this is premature. The mere fact that a plaintiff must plead facts which can overcome a qualified immunity defense does not automatically transform a motion to dismiss into a motion for summary judgment. The question remains at this stage whether Plaintiff has pled facts which plausibly suggest Taylor's force was excessive under the qualified immunity standard. Plaintiff has met her burden in this regard.

Supreme Court precedent demonstrates that an officer violates the Fourth Amendment when he shoots an unarmed person who poses no immediate threat to others. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 2 (1985). More specifically, the Fifth Circuit has held that "it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Lytle v. Bexar Cnty., Texas*, 560 F.3d 404, 408 (5th Cir. 2009).

Plaintiff's complaint repeatedly and plausibly alleges that Ramos posed no immediate danger to others. First, Plaintiff's complaint makes clear that Ramos was unarmed, and more crucially, that this was made aware to the officers at the scene. (2d. Am. Compl., Dkt. 45, at 6). Plaintiff alleges

that Ramos held his hands up for several minutes listening to conflicting directions from the police and pleaded with them to put their own rifles down because he was unarmed. (*Id.* at 6, 12). The passenger next to Ramos had already left the vehicle. (*Id.* at 13). Ramos made no move to reach for a weapon in the car. (*Id.* at 15). Plaintiff also alleges that the Prius "turned away from Taylor and all officers and headed slowly in the opposite direction" and "inched away toward" a dead end. (*Id.*). Plaintiff alleges that Taylor was not in front of the Prius when he fired his shots. (*Id.*). All of these alleged facts suggest that Ramos could not have reasonably posed a threat to Taylor or other officers.

The complaint also states facts that suggest Taylor could not have reasonably believed a Prius, moving slowly from a few yards away, would have been able to cause any injury to officers standing behind "a three-ton vehicle with a grill outfitted with bull bars." (*Id.* at 16). To support this claim, Plaintiff includes a photo of a bystander's video that shows the Prius clearly angled away from the police cars. (*Id.*). Based on the four corners of this complaint, Plaintiff has plausibly alleged that Taylor violated Ramos's constitutional rights and acted with unreasonable and excessive force.

Perhaps most importantly, Taylor's claim that he acted reasonably is belied by Plaintiff's allegation that Taylor was the only officer to fire his weapon at the car. (2d. Am. Compl., Dkt. 45, at 15). Six other officers at the scene had rifles pointed at Ramos, but only Taylor fired live shots. Drawing an inference in favor of the Plaintiff, it is difficult to see how Taylor acted reasonably— especially viewing the facts in the light most favorable to Plaintiff—when six other officers decided not to shoot. Because it is plausible that the excessiveness of the force was unreasonable, Plaintiff has met her burden at the pleading stage. *Roque*, 993 F.3d at 333.

Taylor urges the Court instead to dismiss the complaint based on a test adopted in *Hathaway v. Bazany*, 507 F.3d 312, 321 (5th Cir. 2007). This inquiry examines (1) the time an officer has to respond to a moving vehicle and (2) the physical proximity of the officer to the moving vehicle. *Id.*;

*see also Roque*, 993 F.3d at 333 (citing *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005)). Both *Hathway* and *Roque* were decided at the summary judgment stage, so their relevance here is limited. In addition, *Hathaway* materially differs from the instant case because the police officer in that was case was rammed by a car on an open street, whereas Ramos was stuck in a parking lot. (*Id.* at 314–6). Nonetheless, even assuming *Hathaway* does apply, Plaintiff's complaint sufficiently alleges that neither the timing nor the proximity rendered Taylor's actions unreasonable. The complaint describes Ramos's driving as "slow" and "inch[ing]", while his car was turned away from the officers. (2d. Am. Compl., Dkt. 45, at 15) ("The Prius turned away from Taylor and all officers and headed slowly in the opposite direction."). At this stage, where the Court accepts Plaintiff's well-plead facts as true, the complaint suggests that Taylor had time to realize Ramos posed no threat. In addition, while only seconds elapsed between when Ramos started his car and when Taylor fired the shots, these seconds were preceded by several minutes of Ramos standing with his hands up, begging the officers to put their weapons down. (*Id.* at 3–10). Taylor also directed Pieper to fire a less lethal round at Taylor. (*Id.* at 13). This itself was plausibly an excessive use of force as alleged by Plaintiff. Ramos had stood with his hands up for several minutes pleading with several officers to lower their semi-automatic rifles pointed at him, stating repeatedly that he did not have a gun. (*Id.* at 11–13). It is a reasonable inference that order an officer to shoot him with a less lethal round under these circumstances was an excessive and unreasonable use of force. Based on the facts alleged in Plaintiff's complaint, Taylor had sufficient time to realize that Ramos posed no violent threat.

Likewise, Plaintiff's complaint alleges that there was enough distance from Ramos to Taylor that he could not have reasonably feared being hit by the car when he shot. As the complaint states, "Talyor was the closest of any officer and he was a substantial distance from the car. The Prius is driving away from the officers[.]" (*Id.* at 16). Additionally, the proximity is mitigated by the fact that Taylor and every other officer was standing behind police vehicles specially equipped to handle

impacts from cars. (*Id.*). Whether Taylor or any other officer could have reasonably feared the impact from a compact car driving from start while they stood behind specially equipped police SUVs is a question to be decided by a jury, or potentially at summary judgment. For now, Plaintiff has plausibly alleged that Taylor could not have reasonably feared for his life under these circumstances.

In his motion, Taylor relies heavily on cases suggesting that officers are immune from split-second decisions. (Taylor's Mot. Dismiss, Dkt. 49, at 12–14). Every case cited by Taylor, however, deals with a motion for summary judgment, not a motion to dismiss. *See Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (affirming grant of summary judgment); *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009) (reversing denial of summary judgment); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020) (affirming summary judgment in part*); Irwin v. Santiago*, No. 21-10020, 2021 WL 4932988 (5th Cir. Oct. 21, 2021) (unpublished) (affirming grant of summary judgment). There is a reason that these cases are dealt with at summary judgment, and not in a 12(b)(6) motion—they hinge on a question of fact that is inappropriate at the pleading stage. The reasonableness of a "split-second" decision is a question that requires an investigation into the facts of the case and is more suited to disposition after the parties have conducted discovery. It may very well be that the evidence produced shows no genuine dispute that Taylor could have feared for his life, but such a question must be reserved for when the Court has full evidence of the incident before it.

At this early stage, these cases do not show that Plaintiff failed to plead an unreasonable and excessive use of force. The Fifth Circuit in *Irwin* did hold that "the projected path of Irwin's vehicle was in the officer's direction, at least generally," and that the officers were not unreasonable in firing at the vehicle. *Irwin v. Santiago*, No. 21-10020, 2021 WL 4932988 (5th Cir. Oct. 21, 2021) (unpublished). Plaintiff's complaint alleges a very different scenario. Unlike in *Irwin*, where a car

"narrowly avoided one of the two officers," the instant case presents a scenario where the officers were protected by their own vehicles and standing beside them such that it would have been physically impossible to be directly hit by Ramos's Prius. (2d. Am. Compl., Dkt. 45, at 16; *Irwin*, 2021 WL 4932988 at *1). Nor does *Irwin* overturn *Lytle*, which held that it was unlawful to shoot at a car that was, at the moment of the shooting, driving away from the officer. *Irwin*, 2021 WL 4932988 at *3 (citing *Lytle v. Bexar County*, Texas, 560 F.3d 404, 409 (5th Cir. 2009)). Plaintiff has pled a set of facts that are distinguishable from *Irwin* and suggest Taylor violated established law. She has thus pled a set of facts sufficient to survive a motion to dismiss.

### C. The City's Motion to Dismiss

Finally, the Court turns to the City's motion to dismiss, (Dkt. 47), which argues that Plaintiff's claims are insufficient to establish a claim under *Monell*. (City's Mot. Dismiss, Dkt. 47, at 3 (citing *Monell v. Dep't of Social Service of City of New York*, 436 U.S. 658 (1978)). In order to survive a motion to dismiss under *Monell*, a plaintiff's pleadings "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). However, the fact that a defendant has invoked *Monell* does not raise the plaintiff's pleading requirements above the *Twombly* and *Iqbal* standard. *See id.*; *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). The proper inquiry is whether a plaintiff pleads "facts that plausibly establish: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Ratliff*, 849 F.3d at 285 (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

In total, Plaintiff alleges seven different practices that violated Ramos's civil rights:

a. Disproportionate use of excessive force against people of color,
b. Condoning such disproportionate use of excessive force against people of color
c. Choosing not to adequately train officers regarding civil rights protected by the United States Constitution,

    d.  Choosing not to adequately supervise officers regarding the use of force against people of color,

    e.  Choosing not to intervene to stop excessive force and civil rights violations by its officers,

    f.  Choosing not to investigate excessive violence and civil rights violations by its officers, and

    g.  Making the deliberate choice not to discipline officers for— and deter officers from—using excessive force and violating civil rights.

(2d. Am. Compl., Dkt. 45, at 29).

At their core, these alleged practices constitute three distinct violations: (1) a policy and custom of discriminatory policing, (2) a failure to train officers not to violate the civil rights of residents, and (3) the failure to discipline officers for misconduct. The Court will address each claim in turn.

### 1.  The Institutional Racism Claim

The City argues that Plaintiff's evidence of institutional racism is too attenuated from the actual harm suffered by Ramos and his family. (City's Mot. Dismiss, Dkt. 47, at 3–4). "[T]o plead a practice so persistent and widespread as to practically have the force of law, [the plaintiff] must do more than describe the incident that gave rise to his injury." *Ratliff*, 849 F.3d at 285 (quoting *Pena v. Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018)). A plaintiff may show a "persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, (5th Cir. 1984) (en banc)). However, "[a]ctions of officers or employees of a municipality do not render the municipality liable under section 1983 unless they execute official policy as above defined." *Id.* "[A] facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)). "Deliberate indifference of this sort is a stringent test, and a showing of simple or even heightened negligence will not suffice to prove municipal culpability." *Id.*

In her complaint, Plaintiff does not allege that the City explicitly adopted a policy of discriminating against Black or Hispanic citizens in policing. Instead, Plaintiff's allegations focus on findings from reports—including one from the Austin City Council—which show that APD consistently engaged in increased violence against Black people and other people of color. (2d. Am. Compl., Dkt. 45, at 20). The complaint also alleges that APD officers were more likely to shoot Black individuals. (*Id.*). Likewise, the complaint alleges that APD officers were more likely to arrest people of color and give more warnings to people of color. (*Id.* at 20–22). She cites a statement from the Austin City Council which says, "The elected members of City Council have no confidence that current Austin Police Department leadership intends to implement the policy and culture changes required to end the disproportionate impact of police violence on Black Americans, Latinx Americans, other nonwhite ethnic communities." (*Id.* at 23). Finally, the complaint points to a report which stated that an assistant APD chief frequently used racial slurs, but also noted that anyone reporting such slurs "must be prepared in the present climate and culture to face almost certain retaliation" from APD. (*Id.*).

However, the relevant inquiry under *Monell* is not whether the City's policies had a disproportionate impact upon people of color, but whether this policy was promulgated with deliberate indifference to the "known or obvious consequences" that constitutional violations would result. *Bryan County*, 520 U.S. at 403. Plaintiff's complaint does not qualify under this "stringent test." *Id.* Plaintiff fails to allege a pattern or custom from APD with the known and obvious consequence of discriminating against people of color. Plaintiff's allegations suggest that the City's policies had discriminatory effects, but not that these effects were known or obvious. Plaintiff cites studies showing that APD was more likely to use deadly force against people of color, but not that this was a known result of the City's policies.

Nor does Plaintiff's complaint show a "moving force causation" between this discrimination and the shooting of Mike Ramos. A plaintiff must allege that an official policy or custom "was a cause in fact of the deprivation of rights inflicted." *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)). Plaintiff does allege that Austin police were "more likely to shoot rather than use their hand-to-hand training or deploy pepper spray when the person subjected to force was Black." (2d. Am. Compl., Dkt. 45, at 20). Nonetheless, Plaintiff fails to show that this disproportionate use of deadly force against Black residents was a "cause-in-fact" of the shooting of Taylor. Under Fifth Circuit precedent, the Court finds that the fact that APD's police force disproportionate targets people of color is insufficient, absent more evidence, to support a finding that its customs and practices were a cause-in-fact of Ramos's shooting.

## 2.  Failure to Train

Plaintiff also alleges that the City failed to train officers properly and to adequately supervise them. (2d. Am. Compl., Dkt. 45, at 29). "To prevail on a failure-to-train theory, [a plaintiff] must plead facts plausibly establishing "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010). However, courts should treat failure to train claims with a high degree of caution. "A municipality's culpability for a deprivation of right is at its most tenuous where the claim turns upon a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff must demonstrate "at least a pattern of similar incidents" to establish municipal liability. *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (internal citations omitted).

Here, Plaintiff's complaint alleges two training failures. The first is that the City failed to "adequately train officers regarding civil rights protected by the United States Constitution [and

chose] not to adequately supervise officers regarding the use of force against people of color." This allegation, however, lacks factual support. By itself, the claim is a conclusory statement which the Court must strike. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The claim lacks sufficient facts to suggest plausibly allege the City was "deliberately indifferent" in its training policy. Plaintiff relies on the City Council's report criticizing APD for using a "paramilitary approach to policing." (2d. Am. Compl., Dkt. 45, at 19). She further relies on studies highlighting the disproportionate violence used against Black residents to show that APD failed to train its officers. (*Id.* at 18–24). However, the fact that the City criticized APD for this training approach *after* the Ramos shooting does not show that it was deliberately indifferent to the inadequacy of its training. Moreover, the studies which show the disproportionate impact do not suggest that the City knew its training was inadequate.

Second, Plaintiff appears to allege that "APD policy or practice allowed Pieper to be in field training, even though he had only completed minimal training." (*Id.* at 10 n.6). She further states that APD policy requires officers to go through four months of "academy" before entering field training. Officer Pieper, when he fired a less-lethal round at Ramos, was allegedly only in this third month with the APD. (*Id.*). However, Plaintiff does not actually state any facts. There is no indication that this incident was a pattern with APD or that the City knew of it happening. Accordingly, the Court will dismiss Plaintiff's claim for failure to train.

### 3.  Inadequate Disciplinary Policies

Finally, Plaintiff alleges that APD implemented inadequate disciplinary policies with its officers. In order to plead a failure to discipline, a plaintiff must show: (1) the municipality failed to discipline its employees; (2) that failure to discipline amounted to deliberate indifference; and (3) the failure to discipline directly caused the constitutional violations in question. *See Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009). When a municipality approves a subordinate's conduct and the

basis for it, liability for that conduct is chargeable against the municipality because it has "retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016); *see also Balle v. Nueces Cty., Tex.*, 690 F. App'x 847, 852 (5th Cir. 2017).

Here, a core part of Plaintiff's claim rests upon a 2019 incident involving two of the same officers who responded to the Ramos call—Officers Taylor and Kyrcia. According to Plaintiff's complaint, on July 31, 2019, four APD officers responded to a welfare check call in an Austin high-rise. (2d. Am. Compl., Dkt. 45, at 18–19). When they got to the scene, Taylor and Krycia encountered Dr. Mauris DeSilva, a neuroscientist who was having a mental health episode. Despite having knowledge of Dr. DeSilva's mental health history, Taylor and Krycia both shot and killed Dr. DeSilva. (*Id.*). After the shooting, APD allowed Taylor and Krycia to return to duty. (*Id.* at 19). On August 27, 2021, a grand jury indicted Taylor and Krycia for the shooting. (*Id.*).

Plaintiff argues that the City had inadequate disciplinary policies based on APD's failure to punish officers whose conduct was sufficient to receive a grand jury indictment. Plaintiff further alleges that APD ratified this conduct because it consistently failed to discipline Taylor for his excessive uses of force and constitutional violations. (*Id.* at 29–30). Plaintiff states that the City compounded the failure to discipline because it did not punish Taylor for shooting Ramos. Although APD played Taylor on administrative leave after the Ramos shooting, APD never subjected him to any other discipline, according to the complaint. (*Id.* at 18).

Plaintiff's claim that the City should have disciplined Taylor and Krycia for this incident is sufficient to survive the motion to dismiss. *Deville*'s three-pronged test applies here, asking whether (1) the municipality failed to discipline its employees; (2) that failure to discipline amounted to deliberate indifference; and (3) the failure to discipline directly caused the constitutional violations in question. *Deville*, 567 F.3d at 171. Here, Plaintiff's allegations meet the first prong. The City failed to

discipline Taylor at all for his involvement in the shooting of Dr. DeSilva, for which a grand jury indicted him for murder and third-degree felony deadly conduct. (2d. Am. Compl., Dkt. 45, at 19). Likewise, placing an officer on administrative leave generally does not amount to "discipline" under *Monell. See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (citing *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642 (5th Cir. 2002), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). In light of the fact that APD allegedly failed to discipline officers for conduct that a grant jury found sufficient to warrant an indictment for murder, Plaintiff has adequately alleged that APD maintained a deliberate policy of improperly disciplining officers for excessive force.

Plaintiff has also plausibly alleged that the City knew of the shootings and was deliberately indifferent to them. The shooting of Dr. DeSilva was a high-profile incident that received significant press coverage, as well as statements from APD officials.[2] Given the notoriety of the shooting, as well as the fact that APD briefed the shooting to local media, it is more than plausible that the City knew of the shooting but deliberately chose not to discipline the officers involved. The same is true for the shooting of Ramos himself, which led to major protests in Austin.[3] Plaintiff's complaint alleges two separate incidents where the City knew of a lethal and unwarranted shooting but failed to discipline the officers responsible. It is a reasonable inference at this stage that the City's disciplinary policies—as described by Plaintiff—deliberately failed to sanction conduct that violated § 1983.

---

[2] *See, e.g.*, Mark D. Wilson, *Man killed in police shooting in downtown Austin ID'd*, AUSTIN AM. STATESMAN, (Aug. 2, 2019), https://www.statesman.com/story/news/local/2019/08/02/man-killed-in-police-shooting-in-downtown-austin-idd/4550313007; Drew Knight & Britny Eubank, *Police identify man killed in officer-involved shooting in Downtown Austin*, KVUE, (Aug. 2, 2019), https://www.kvue.com/article/news/local/police-responding-to-officer-involved-shooting-in-downtown-austin/269-9ae26db2-0796-46ab-8fe3-46e0922a176d. *See also*, *Roque v. Harvel*, No. 1:17-CV-932-LY-SH, 2019 WL 5265292 (W.D. Tex. Oct. 16, 2019) (noting that newspaper articles are relevant for the purpose of notice of excessive use of force).
[3] *See, e.g.*, Michael Barajas, *Why Protestors in Austin are Chanting 'Justice for Mike Ramos'*, TEXAS OBSERVER (June 5, 2020), https://www.texasobserver.org/mike-ramos-austin-police.

Finally, Plaintiff has plausibly alleged that the failure to discipline directly caused the death of Ramos. In both instances, Taylor shot an unarmed man, and it is reasonable to infer that the City's failure to sanction the shooting of Dr. DeSilva implicitly condoned APD's excessive use of force. *See Rivera v. City of San Antonio* No. SA-06-CA-235-XR, 2006 WL 3340908, at *13 (W.D. Tex. 2006) (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985) ("Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied."). The excessive use of force—both telling Pieper to shoot Ramos with a less lethal round and Taylor's own gunshots—are alleged to be the direct causes of Ramos's death. Given the City's alleged prior failures to discipline, Plaintiff plausibly suggests that Taylor's excessive use of force was a result of APD's failure to discourage such conduct.

In response, the City alleges that the actions of its officers were not "manifestly indefensible." (City's Mot. Dismiss, Dkt. 47, at 7–9). This assertion is premature. Whether APD's actions were manifestly indefensible is a question for the jury, or perhaps summary judgment, but it is a question of fact that is not properly before the Court at a motion to dismiss. The relevant inquiry is simply whether Plaintiff has met its burden of pleading facts which plausibly show a manifestly indefensible act. *Iqbal*, 556 U.S. at 678–79 (2009). Plaintiff has pled that Taylor's actions have led to two grand jury indictments for murder in state court. Indeed, Plaintiff's complaint sets out facts which plausibly suggest that Taylor has, on two occasions, met the elements of criminal homicide under Texas law. To put it simply, an allegation of an unlawful killing, supported by properly alleged facts, is more than sufficient to plead a manifestly indefensible action. The fact that the City twice failed to discipline Taylor after these deaths plausibly suggests that the City condoned excessive uses of force and had a policy of failing to properly discipline its officers. Accordingly, the City's motion to dismiss is denied as to the inadequate disciplinary policies claim.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendant Christopher Taylor's motion to dismiss, (Dkt. 49), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion to strike, (Dkt. 66), is **MOOT**.

**IT IS FURTHER ORDERED** that the City of Austin's motion to dismiss, (Dkt. 47), is **GRANTED IN PART** as to Plaintiff's first four claims, (2d. Am. Compl., Dkt. 45, at 29), of using or condoning disproportionate use of force against people of color, failure to train, and failure to supervise. The City's motion to dismiss is **DENIED IN PART** as to Plaintiff's final three claims of choosing not to intervene to stop excessive force violations, choosing not to investigate excessive violence, and making the deliberate choice not to discipline officers for excessive force.

**SIGNED** on December 18, 2022.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE